ORAL ARGUMENT NOT YET SCHEDULED

CASE NOS. 22-1320, 23-1009

**IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

_____

ABSOLUTE HEALTHCARE, D/B/A, CURALEAF ARIZONA,
Petitioner/Cross-Respondent,

vs.

NATIONAL LABOR RELATIONS BOARD,
Respondent/Cross-Petitioner

_____

ON PETITION FOR REVIEW
FROM ORDER OF THE NATIONAL LABOR RELATIONS BOARD
372 NLRB No. 16 (Dec. 8, 2022)

_____

**FINAL OPENING BRIEF OF PETITIONER
(DEFERRED APPENDIX)**

_____

Maurice Baskin
Stefan Marculewicz
Emily Carapella
Littler Mendelson, PC
815 Connecticut Ave, N.W., Ste. 400
Washington, D.C. 20006
T: (202) 842-3400
F: (202) 842-0011
mbaskin@littler.com
smarculewicz@littler.com
ecarapella@littler.com

*Attorneys for Petitioner Absolute
Healthcare d/b/a Curaleaf Arizona*

## RULE 26.1 CORPORATE DISCLOSURE STATEMENT

Petitioner Absolute Healthcare d/b/a Curaleaf Arizona ("Petitioner"), hereby makes the following Corporate Disclosure Statement:

(1)     Petitioner's parent corporation is CLF AZ Management Inc.;

(2)     Curaleaf, Inc. is the sole shareholder of Petitioner's parent corporation;

(3)     Curaleaf, Inc. is a publicly traded company that indirectly owns 10% or more of Petitioner's stock; and

(4)     Petitioner is a medical and recreational cannabis company.

*/s/Maurice Baskin*
Maurice Baskin

## PETITIONER'S CERTIFICATE OF PARTIES, RULINGS AND RELATED CASES

**A.     Parties and Amici.**

1.     Curaleaf is the Petitioner and Cross-Respondent.

2.     The National Labor Relations Board ("Board" or "NLRB") is the Respondent and Cross-Applicant for Enforcement.

3.     Anissa Keane ("Keane") was the Charging Party in the underlying proceedings before Region 28 of the NLRB.

**B.     Rulings Under Review.**

Curaleaf seeks review of the Decision and Order of the National Labor Relations Board issued against Curaleaf on December 8, 2022, reported at 371 NLRB No. 16, in NLRB Case No. 28-CA-267540, which is captioned as *Absolute Healthcare d/b/a Curaleaf Arizona and Anissa Keane*.

**C.     Related Cases.**

Curaleaf is aware of no related cases before this or any other court.

/s/ Maurice Baskin
Maurice Baskin

## **TABLE OF CONTENTS**

I.   JURISDICTION ..........................................................................................1

II.  ISSUES PRESENTED ................................................................................1

III. RELEVANT STATUTES AND REGULATIONS ..........................................2

IV.  STATEMENT OF THE CASE AND FACTS ...............................................3

A.  Factual Background ...............................................................................3

     1.   *Curaleaf's Heavily Regulated Operations* ..............................................3

     2.   *Curaleaf's Progressive Discipline Policy* ................................................5

     3.   *Anissa Keane's Disciplinary History* ......................................................6

     4.   *Union Activity at Curaleaf's Gilbert, Arizona Facility*.........................9

B.  The ALJ's Decision.................................................................................10

C.  The Board's Decision.............................................................................11

D.  Curaleaf's Petition for Review and the Board's Cross Application for
     Enforcement................................................................................................12

V.   SUMMARY OF ARGUMENT .....................................................................12

VI.  STANDING .................................................................................................14

VII. STANDARD OF REVIEW ..........................................................................15

VIII. ARGUMENT................................................................................................16

A.  This Court Should Not Enforce the Board's Finding That Keane's Termination
     Violated the NLRA, as Board Precedent and Substantial Record Evidence
     Show the Termination Was Lawful...........................................................16

     1.   *The Legal Standard For Applying Wright Line.* .................................16

2.    *The Board Erred in Finding That the General Counsel Met Its Burden at Wright Line Step One* ......................................................................19

3.    *The Board Erred in Finding That Curaleaf Would Not Have Terminated Keane Absent Union Activity* ...........................................30

B.    This Court Should Not Enforce the Board's Extraordinary Notice Reading Remedy ..............................................................................................35

1.    *Legal Standard for Reviewing the Board's Remedies* .......................35

2.    *Board Precedent and Record Evidence Here Do Not Justify the Board's Decision to Impose a Notice Reading Remedy* ....................36

C.    This Court Should Not Enforce the Board's Extraordinary Union Access Remedy ..............................................................................................40

D.    The Board's Extraordinary Remedies Violate Curaleaf's Constitutional Rights ...............................................................................................48

IX.  CONCLUSION .........................................................................................49

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*A.P.R.A. Fuel Oil Buyers Grp.*,
 309 NLRB 480 (1992) ........................................................................38

*ABM Onsite-Servs.-West, Inc. v. NLRB*,
 849 F.3d 1137 (D.C. Cir. 2017) .........................................................15

*Allentown Mack Sales & Serv. v. NLRB*,
 522 U.S. 359 (1998) ....................................................................16, 32

*Asarco, Inc. v. NLRB*,
 86 F.3d 1401 (5th Cir. 1996) ..............................................................24

*Bally's Park Place*,
 355 NLRB 1319 (2010), *enf'd*, 646 F.3d 929 (D.C. Cir. 2011) .........30

*Boar's Head Provisions, Co.*,
 370 NLRB No. 124 (2021) .............................................................17, 21

*Bodega Latina Corp.*,
 367 NLRB No. 34 (2018) .....................................................................36

*Bozzuto's Inc. v. NLRB*,
 927 F.3d 672 (2d Cir. 2019) .........................................................37, 38

*Bozzuto's*,
 365 NLRB No. 146 (2017) ...................................................................37

*Castro Valley Animal Hospital, Inc.*,
 370 NLRB No. 80 (2021) .....................................................................36

*Cedar Point Nursery v. Hassid*,
 141 S. Ct. 2063 (2021) .........................................................................47

*Cellco Partnership v. NLRB*,
 892 F.3d 1256 (D.C. Cir. 2018) .........................................16, 17, 18, 23, 29

*Circus Circus Casinos, Inc. v. NLRB*,
 961 F.3d 469 (D.C. Cir. 2020) ......................... 15, 16, 18, 29, 30, 31, 34, 40

iii

*Conair Corp. v. NLRB,*
    721 F.2d 1355 (D.C. Cir. 1983) ..........................................................35

*Denton Cty. Elec. Coop., Inc. v. NLRB,*
    962 F.3d 161 (5th Cir. 2020) ..............................................................36

*Dupuy v. NLRB,*
    806 F.3d 556 (D.C. Cir. 2015) .......................................................... 25

*Electrolux Home Prod. Inc.,*
    368 NLRB No. 34 (2019) ......................................................17, 26, 27

*Everport Terminal Servs. v. NLRB,*
    47 F.4th 782 (D.C. Cir. 2022) .............................................................15

*First Legal Support Services,*
    342 NLRB 350 (2004) ........................................................40, 44, 46

*Florida Steel Corp. v. NLRB,*
    713 F.2d 823 (D.C. Cir. 1983) ...........................................35, 40, 43, 44

*Framan Mechanical Inc.,*
    343 NLRB 408 (2004) ........................................................................18

*Fred Meyer Stores, Inc. v. NLRB,*
    865 F.3d 630 (D.C. Cir. 2017) ......................................................16, 33

*Gavilion Grain, LLC,*
    371 NLRB No. 79 (2022) ...................................................................38

*Hawaiian Dredging Constr. Co. Inc. v. NLRB,*
    857 F.3d 877 (D.C. Cir. 2017) ...................................15, 24, 29, 34, 40

*HTH Corp. v. NLRB,*
    823 F.3d 668 (D.C. Cir. 2016) ..........................................35, 39, 40

*Johanns v. Livestock Mktg. Ass'n,*
    544 U.S. 550 (2005) ...........................................................................47

*Kitsap Tenant Support Services,*
    366 NLRB No. 98 (2018) ...................................................................21

iv

*Lechmere Inc. v. NLRB*,
  502 U.S. 527 (1992) ...........................................................41, 42, 43, 44

*Mid-Mountain Foods, Inc.*,
  350 NLRB 742 (2007) .....................................................................26

*Mondelez Global, LLC*,
  369 NLRB No. 46 (2020) ................................................................20

*NLRB v. Babcock & Wilcox Co.*,
  351 U.S. 105 (1956) ............................................................41, 43, 44

*NLRB v. Homer D. Bronson Co.*,
  273 Fed. App'x 32 (2d Cir. 2008) ...............................................39, 40

*Palace Sports & Entertainment, Inc. v. NLRB*,
  411 F.3d 212 (D.C. Cir. 2005) ........................................................30

*Queen of the Valley Med. Ctr.*,
  368 NLRB No. 116 (2019) ........................................17, 20, 36, 37

*Republic Steel Corp. v. NLRB*,
  311 U.S. 7 (1940) ..........................................................................34

*Retail Clerks Local 1059 v. NLRB*,
  348 F. 2d 369 (D.C. Cir. 1965) .......................................................14

*Roberts v. U.S. Jaycees*,
  468 U.S. 609 (1984) .......................................................................47

*Salem Hosp. Corp.*,
  363 NLRB 515 (2015) .....................................................................39

*Salem Hosp. Corp. v. NLRB*,
  808 F.3d 59 (D.C. Cir. 2015) ..........................................................39

*Sasol N. Am., Inc. v. NLRB*,
  275 F.3d 1106 (D.C. Cir. 2002) .................................................19, 31

*St. Francis Hospital*,
  263 NLRB 834 (1982) ..............................................40, 41, 42, 44

*Stern Produce Co.*,
    368 NLRB No. 31 (2019) ...........................................................45, 46

*Sutter E. Bay Hosps. v. NLRB*,
    687 F.3d 424 (D.C. Cir. 2012) ...............................................15, 18, 46

*Sysco Grand Rapids, LLC v. NLRB*,
    825 Fed. App'x 348 (6th Cir. 2020) ..................................42, 44, 45, 47

*Tesla, Inc.*,
    370 NLRB No. 101 (2021) .........................................................36, 38

*Tramont Mfg., LLC v. NLRB*,
    890 F.3d 1114 (D.C. Cir. 2018) ........................................................15

*Tschiggfrie Properties, Ltd.*,
    368 NLRB No. 120 (2019) ...............................................................17

*Upper Great Lakes Pilots, Inc.*,
    311 NLRB 131 (1993) ......................................................................17

*United Dairy Farmers Cooperative Ass'n v. NLRB*,
    633 F.2d 1054 (3d Cir. 1980) ...........................................................45

*Wendt Corporation*,
    369 NLRB No. 135 (2020), *enf'd in part*, 26 F.4th 1002 (D.C. Cir. 2022) ...................................................................................................34

*Windsor Redding Care Ctr., LLC v. NLRB*,
    944 F.3d 294 (D.C. Cir. 2019)....................... 15, 16, 17, 18, 26, 27, 28

*Wright Line*,
    251 NLRB 1083 (1980) ........................ 11, 16, 17, 18, 19, 21, 23, 29, 30, 31, 34

**Statutes**

Ariz. Rev. Stat. § 36-2806.02 (2022)........................................................3

National Labor Relations Act, 29 U.S.C. § 151 *et seq.* ......................1, 2, 10, 12, 13, .......................................... 14, 15, 16, 24, 30, 31, 34, 35, 36, 37, 38, 39, 40, 43, 44

Administrative Procedure Act, 5 U.S.C. § 701 *et seq.* ................................2, 14, 15

**Other Authorities**

U.S. Constitution, First Amendment ...............................................46, 47

Arizona Administrative Code Rule 9-17-314 (2019) ...........................................2, 3

**<u>GLOSSARY</u>**

ALJ:            Administrative Law Judge Dickie Montemayor

APA:            Administrative Procedure Act

JA:             Deferred Joint Appendix

NLRA:           National Labor Relations Act

NLRB or Board:      National Labor Relations Board

Union:          United Food and Commercial Workers (UCFW), Local 99

Petitioner or Curaleaf:      Petitioner Absolute Healthcare d/b/a Curaleaf Arizona

General Counsel:   The General Counsel for the National Labor Relations Board

Tr:             Transcript of ALJ hearing

# I.     JURISDICTION

This is a petition for review from the Board's Decision and Order in Case 28-CA-267540, reported at 371 NLRB No. 16 (December 8, 2022), and a cross-application for enforcement by the Board, over which this Court has jurisdiction pursuant to Section 10 of the NLRA, 29 U.S.C. § 160. The Board issued its Decision on December 8, 2022. The Board's Decision is final with respect to all parties. Curaleaf timely filed its Petition for Review on December 16, 2022 and the Board cross-appealed for enforcement on January 19, 2023.

# II.     ISSUES PRESENTED

1.     Whether the Board's Decision and Order must be denied enforcement because it departed from controlling precedent under the National Labor Relations Act ("NLRA") when it found that Curaleaf violated the NLRA by unlawfully discharging Anissa Keane ("Keane").

2.     Whether the Board's Decision and Order must be denied enforcement because it departed from controlling precedent under the NLRA when it found that the General Counsel sustained its *prima facie* case by showing animus motivated Curaleaf's decision to terminate Keane.

3.     Whether the Board's Decision and Order must be denied enforcement because it departed from controlling precedent under the NLRA and ignored

substantial evidence in the record when it found that Curaleaf failed to show that it would have terminated Keane even in the absence of her union activities.

4.      Whether the Board's Decision and Order must be denied enforcement because it departed from controlling precedent under the NLRA in concluding that Curaleaf's comparative treatment of Keane and another employee, Tyler Tanselle-Hubbard, was evidence of animus.

5.      Whether the Board's Decision and Order must be denied enforcement because it departed from controlling precedent in this Court when it applied a notice-reading remedy.

6.      Whether the Board's Decision and Order must be denied enforcement because it departed from controlling precedent in ordering an extraordinary and punitive union access remedy.

7.      Whether the Board's Decision and Order must be denied enforcement because it violated Curaleaf's Constitutional rights.

## III.   RELEVANT STATUTES AND REGULATIONS

Pertinent sections of the NLRA, the APA, the Arizona Revised Statutes, and the Arizona Administrative Code appear in a Statutory Addendum attached to the end of this brief, consistent with Circuit Rule 28(a)(5).

## IV.    STATEMENT OF THE CASE AND FACTS

### A.    Factual Background

#### 1.    *Curaleaf's Heavily Regulated Operations*

Curaleaf operates cannabis dispensaries in Arizona, where the cannabis industry is "highly regulated."[1] (JA235, JA5; NLRB Dec. 12 (ALJ), Tr. 17). Before cannabis dispensaries like Curaleaf can allot medical marijuana to patients, state regulations require that dispensary associates[2] "[v]erify the qualifying patient's...identity, the validity of the registry identification, and the amount of medical marijuana that would not cause the patient to exceed the two and one half ounces limit of medical marijuana during a 14 calendar day period." (JA119; R. Ex. 1, at 4); *see also* Ariz. Rev. Stat. § 36-2806.02; Ariz. Admin. Code § R9-17-314 (2019). The Arizona Department of Health Services' Medical Marijuana Inspection Sheet reflects the allotment procedures for dispensaries. (JA116; R. Ex. 1).

A dispensary associate's allotment errors can place Curaleaf at risk of corrective action from the state, such as fines or loss of license. (JA51-52; Tr. 130-31). For example, if a dispensary associate fails to allot a transaction in the state's

---

[1] This statement of facts discusses the state of Arizona law and Curaleaf's policies at the time of the underlying ULP proceeding. Although recreational marijuana is now legal in Arizona, it was not legal at the time of Keane's employment with Curaleaf.

[2] Dispensary associates, also referred to into the record as agents and budtenders, check in medical marijuana patients and sell Curaleaf products to the patients. (JA10-12, JA224; Tr. 29-31; NLRB Dec. 1).

system, "[t]he budtender, sales associate, would receive a number of violations" and "[Curaleaf] would also have a ding on [its] license that could be financial, or [the state] could just suspend [Curaleaf's] license or take it." (JA58-59; Tr. 141-42). A dispensary associate's allotment errors can also place Curaleaf patients at risk for legal trouble: "The incorrect tracking, it affects the patient who's possessing it. Because it would not be properly allotted, [the patient] could be held accountable by local law enforcement due to incorrectly possessing that product." (JA39; Tr. 101).

Curaleaf maintains standard operating procedures ("SOPs"), encapsulating state marijuana dispensing regulations, which it expects employees to follow. (JA40-42, JA47-49, JA128; Tr. 102-04, 120-22, R. Ex. 2). Curaleaf also maintains a Cash Handling Policy with the purpose of "assur[ing] accuracy in [Curaleaf's] cash-handling procedures [and] control of Curaleaf's assets." (JA224, JA10, JA53, JA69; NLRB Dec. 1, Tr. 29, 133, 158). Curaleaf expects dispensary associates to maintain accurate register drawers and tills and holds dispensary associates accountable for cash discrepancies of plus or minus five dollars. (JA54-55, JA132; Tr. 134-35, R. Ex. 4, Sec. 5.6.1). Nevertheless, the Arizona Department of Health Services' Medical Marijuana Inspection Sheet does not expressly address cash handling issues. (JA116-27, JA227, JA233; R. Ex. 1, NLRB Dec. 4 n.16, 10 (Dissent)).

## 2.    *Curaleaf's Progressive Discipline Policy*

Curaleaf maintains a Progressive Discipline Policy that follows four steps regardless of the type of violation underlying each step: verbal warning/counseling, written warning, final written warning, and termination. (JA224, JA43, JA53, JA56, JA66-67, JA147-90; NLRB Dec. 1; Tr. 109, 133, 136, 153-54, R. Ex. 12). Curaleaf Arizona's Human Resources Director, Stephanie Cade ("Cade"), explained Curaleaf's Progressive Disciplinary Policy during the hearing: "Q. Okay, and within that progression, do you apply one progression for any type of performance issue, or do you have . . . separate progressions depending upon the type of incident? A. No, all performance is lumped into one bucket." (JA66-67; Tr. 153-54). In other words, if an employee receives a verbal warning/counseling for a cash handling issue and then incorrectly allots marijuana to a patient, the employee receives a written warning for the allotment issue, because even though it is the employee's first allotment issue, it is the employee's second violation overall. (JA66-67; Tr. 153-54).  Curaleaf's Progressive Discipline Policy also "ha[s] that leniency in our policy in our handbook . . . that says if it is an extreme error, you can escalate it." (JA224, JA21; NLRB Dec. 1; Tr. 42).

Most Curaleaf employees do not need more than a verbal warning/counseling to improve their performance. (JA22; Tr. 43). But consistent with its Progressive Discipline Policy, Curaleaf terminated the employment of

employee Tyler Hubbard ("Hubbard") in 2019 following consecutive violations of Curaleaf policy. (JA21-22, JA113-15; Tr. 42-43; GC Ex. 5). Cade was involved in the decision to terminate Hubbard's employment. (JA22; Tr. 43). The record does not reflect that Hubbard received a verbal warning from Curaleaf. (JA225; NLRB Dec. 2). Nevertheless, the record does indicate that Curaleaf presented Hubbard with a written warning and a final written warning and then ultimately terminated his employment when Hubbard violated Curaleaf's Cash Handling Policy on multiple occasions, including with a final twenty-dollar cash discrepancy. (JA113-15, JA225; GC. Ex. 5; NLRB Dec. 2). Hubbard's written warnings reflect seven cash handling errors in total. (JA225; NLRB Dec. 2).

### 3.    *Anissa Keane's Disciplinary History*

Anissa Keane ("Keane") worked for Curaleaf as a dispensary associate until her employment ended on August 28, 2020. (JA23, JA25; Tr. 47, 57). As was true of former employee Hubbard, Curaleaf expected Keane to pay "attention to detail and accuracy," given the heavily regulated nature of its business. (JA11-12; Tr. 30-31).

Keane received a verbal warning/counseling on April 10, 2020 for a ten-dollar cash discrepancy under the Cash Handling Policy. (JA18, JA68, JA73, JA138, JA225; Tr. 38, 156, 165, R. Ex. 7; NLRB Dec. 2). Gilbert Store Manager Tyler Neier ("Neier") referenced the verbal counseling in an April 28, 2020 email,

6

noting that at that point, his "inventory leads had connected her to several of the audit discrepancies after reviewing tape." (JA139-41; R. Ex. 8). HR Director Cade "trusted in [Neier] that he had the verbal conversation with [Keane] to correct the behavior at that time" and understood that such a verbal conversion would have discussed how Keane "had more discrepancies." (JA68; Tr. 156).

Keane next received a written warning on May 1, 2020, for committing a "horrendous" transaction involving seven errors on April 26, 2020. (JA139-41, JA134-35, JA57, JA225; R. Ex. 8, R. Ex. 5, Tr. 139, NLRB Dec. 2). Specifically, Keane, contrary to state regulations, did not check the patient's medical marijuana card or book the allotment. (JA134-35; R. Ex. 5). Had the state of Arizona audited Curaleaf and uncovered Keane's errors, it could have fined Curaleaf or suspended or revoked Curaleaf's license. (JA59; Tr. 142). Keane has admitted that she made the mistakes in the transaction, received the written warning, and signed the written warning. (JA34-35; Tr. 71-72).  Neier recommended to his superiors and Human Resources thatthey "should go further than a write up" given the severity of Keane's mistakes:

> I am requesting to at least write up Anissa Keane for the transaction below. She made some huge mistakes and I'm not exactly [sure] how she didn't notice all of the issues during the transaction....Her lack of detail and proneness to error makes me concerned that she is not cut out for budtending. In my 4 years of management I have never come across a transaction that is quite this bad. I'd like your feedback on whether I should go further than a write up.

(JA139-41; R. Ex. 8). Curaleaf, however, adhered to its Progressive Discipline Policy and issued Keane a written warning. (JA134-35, JA139-41; R. Exs. 5, 8).

On July 5, 2020, Keane sold medical marijuana to a female patient but allotted the product to a male patient "Brad," who, incidentally, also had an expired medical marijuana card in his profile, revealing three errors. (JA60-61, JA136-37, JA225; Tr. 144-45; R. Ex. 6; NLRB Dec. 2). In doing so, Keane (once again) made Curaleaf "not compliant with company SOP or state regulations." (JA136-37, JA230; R. Ex. 6, NLRB Dec. 7 (Dissent)). Keane has admitted she completed the transaction and that she was aware that another violation of Curaleaf policy would result in her termination. (JA32-34; Tr. 69-71). When Neier learned of the transaction, he suggested termination for Keane:

> I wrote [Keane] up a couple months ago on a transaction that had more mistakes that I've ever seen and I suspect she may still be a large part of our store's discrepancies. I would like to give her a final written warning or terminate her position at the Gilbert location based off of her putting our dispensary license at risk.

(JA142-44; R. Ex. 9) Instead, Curaleaf adhered to its Progressive Discipline Policy, despite the "extreme" situation, and issued Keane her final written warning on July 17, 2020. (JA21, JA70-71, JA142-44; Tr. 42, 160-61; R. Ex. 9).

On August 22, 2020, Keane violated Curaleaf policy once again. (JA109-12; GC Ex. 4). Specifically, Keane violated Curaleaf's Cash Handling Policy with a $20.00 discrepancy. (JA225; NLRB Dec. 2). Keane has acknowledged the

discrepancy. (JA31; Tr. 68). Considering the conduct underlying Keane's verbal warning, written warning, final written warning, and August 22, 2020 cash handling incident, Keane's conduct reflected twelve policy violations.[3] (JA134-38; R. Exs. 5-7; NLRB Dec. 2). Given Keane's lengthy disciplinary history, Curaleaf terminated Keane on August 28, 2020 following her August 22, 2020 violation.[4] (JA19-20, JA62, JA64-65, JA109-12, JA225; Tr. 39-40, 147, 149-50; GC. Ex. 4; NLRB Dec. 2). Indeed, as Curaleaf's Regional Operations Manager for the West Coast, Andrew Holstein, explained during the hearing: "I felt that we weren't gaining any progress with the previous disciplinary action . . . it was just continual mistakes and ignoring the systems that we have in place to avoid these type of errors." (JA64-65; Tr. 149-50). After her termination, Keane was escorted from the dispensary. (JA32; Tr. 69) ("[W]hen I was walking out, I said goodbye and all of them can fuck off.").

### 4. *Union Activity at Curaleaf's Gilbert, Arizona Facility*

In November 2019, Keane contacted the Union about organizing Curaleaf's Gilbert, Arizona facility. (JA224; NLRB Dec. 1). The Union "spoke with a handful

---

[3] Keane testified that her supervisor, Kaitlyn Cook ("Cook"), told her that she would not be terminated unless she made four cash handling errors. (JA225; NLRB Dec. 2). Cade explained that Cook's alleged statement was not accurate. (*Id.*). Cook was not involved in Keane's termination. (JA72; Tr. 162).

[4] Specifically, Neier noted that "[n]ormally we do a verbal warning and then written with cash discrepancies specifically but with the errors she has had and since we have given her a final written warning I think it could be her last." (JA109-12; GC Ex. 4).

of...[Keane's] coworkers." (JA36-37; Tr. 84-85) ("Q. ...Did you speak to employees of Curaleaf out of the Gilbert, Arizona store? A. Yes. There was the handful that I mentioned, it was like four people that I met in person.").

On July 6, 2020, Curaleaf first learned that Keane "had been talking to some of [her coworkers] about unionizing the dispensary." (JA99; NLRB Dec. 1; GC. Ex. 2 at 19). On July 31, 2020, Cade hosted two employee meetings to discuss the merits of unionization. (JA224, JA7, JA27; NLRB Dec. 1; Tr. 26, 61). Curaleaf noted that "[w]e respect our associates and it is their decision to decide whether . . .they want a union." (JA101; GC. Ex. 3 at 2) ("Is Curaleaf Anti-Union? . . . No.")).

## B.    The ALJ's Decision

Following a two-day hearing, (JA4, JA46; Tr. 1, 115), the ALJ concluded that Curaleaf violated Sections 8(a)(1) and 8(a)(3) of the Act by terminating Keane.[5] (JA238-39; NLRB Dec. 15-16 (ALJ)). The ALJ ordered Curaleaf to reinstate Keane and provide her make-whole relief. (JA240-41; NLRB Dec. 17-18 (ALJ)). The ALJ ordered Cade, or if she departs Curaleaf, an equally high-level management official, to publicly read an attached notice in the presence of Board and Union representatives announcing that Curaleaf violated the NLRA. (JA240-41; NLRB Dec. 17-18 (ALJ)). The ALJ further ordered Curaleaf "to give notice of,

---

[5] The ALJ also concluded that Curaleaf violated Section 8(a)(1) of the NLRA through three isolated comments that Keane alleged Curaleaf made during a meeting on July 31, 2020. (JA237-38; NLRB Dec. 14-15 (ALJ)).

and equal time and facilities for the Union to respond to, any address made by the Respondent to its employees on the question of union representation." (JA240; NLRB Dec. 17 (ALJ)).

### C.    The Board's Decision

Curaleaf filed exceptions to the ALJ's conclusion that Keane's termination violated Sections 8(a)(1) and 8(a)(3) of the NLRA.[6] (JA224; NLRB Dec. 1). The Board adopted the ALJ's finding that Curaleaf violated Sections 8(a)(1) and 8(a)(3) of the NLRA by terminating Keane's employment. (JA224, JA225; NLRB Dec. 1, 2). Specifically, the Board agreed with the ALJ that the General Counsel satisfied its initial burden under Board precedent *Wright Line* to show that union activity motivated Keane's termination. (JA225; NLRB Dec. 2). The Board further agreed with the ALJ that Curaleaf did not establish that it would have terminated Keane even if she had not engaged in union activity. (JA225; NLRB Dec. 2). The Board also affirmed the ALJ's decision to issue backpay, reinstatement, notice reading, and union access remedies. (JA228; NLRB Dec. 5).

In dissent, Member Ring explained that he "would find [Curaleaf] showed that it would have discharged Keane regardless of her union activity." (JA230; NLRB Dec. 7 (Dissent)). Member Ring further concluded that "even assuming

---

[6] Curaleaf did not except to the ALJ's additional findings that Curaleaf had violated Section 8(a)(1) through the three isolated comments during the July 31, 2020 meeting. (JA224, JA237-38; NLRB Dec. 1 n.2; 14-15 (ALJ)).

Keane was unlawfully discharged...the extraordinary remedies the majority orders—notice reading and union access—are unwarranted." (JA233; NLRB Dec. 10 (Dissent)). Regarding the union access remedy specifically, Member Ring explained that "there is no evidence that [the Union] was rendered incapable of communicating with [Curaleaf's] employees." (JA233; NLRB Dec. 10 (Dissent)).

### D.    Curaleaf's Petition for Review and the Board's Cross Application for Enforcement

On December 16, 2022, Curaleaf petitioned this Court for review of the Board's Decision. (Pet. for Review). On January 13, 2023, the Board filed a Cross-Application for Enforcement of the Board's Decision. (NLRB Cross-Application). Curaleaf timely answered the Board's Cross-Application for Enforcement on February 1, 2023. (Ans. to Cross-Application).

## V.    SUMMARY OF ARGUMENT

Curaleaf properly terminated Keane for poor performance after presenting her with a verbal warning, a written warning, and a final written warning, all within less than five months. As the Board has acknowledged, Keane's write-ups reflect twelve violations in total. But because Keane happened to be a union organizer as well as a poor performer, the Board has ignored substantial evidence in the record and improperly applied precedent to conclude that Keane's termination violated the NLRA.

The Board has primarily arrived at its erroneous conclusion by fixating on how Curaleaf treated another terminated employee, Hubbard, and concluding that Hubbard received more lenient treatment than Keane. But neither precedent nor substantial evidence in the record indicate that Hubbard received more lenient treatment than Keane, or more fundamentally, that Curaleaf violated the NLRA in terminating Keane. The record reflects that Keane's errors were more numerous than Hubbard's. The record also shows that even before Curaleaf learned of Keane's union activity, Curaleaf believed her violations were particularly severe and her manager recommended escalating the progressive discipline process. The record further reflects that Keane continued to move through Curaleaf's progressive discipline process despite her union activity and ultimately received more warnings than Hubbard did before Curaleaf terminated her employment. By still finding that Keane's termination violated the NLRA, despite contrary precedent and substantial record evidence, the Board has failed to engage in reasoned decision making, and this Court should not enforce the Board's finding.

The Board has further erred in ordering extraordinary remedies against Curaleaf—public notice reading and union access for the next two years. The record does not support either extraordinary remedy, rendering both remedies improperly punitive rather than remedial in nature. Even if this Court concludes that Keane's termination violated the NLRA, Curaleaf's violations of the NLRA

do not justify public notice reading. Further, no record evidence indicates that Curaleaf ever interfered with the Union's ability to communicate with Curaleaf employees; rather, record evidence establishes that the Union frequently communicated with employees.

Where, as here, no record evidence indicates that Curaleaf prevented the Union from contacting Curaleaf employees, a union access remedy invading Curaleaf's property rights contravenes Supreme Court precedent. And even if this Court concludes that an access remedy could be appropriate regardless of the Union's ability to otherwise access employees, an access remedy is still not appropriate here, as the Board has not shown that traditional remedies would not suffice in this situation. Under these circumstances, the Board's imposition of extraordinary remedies here is contrary to both the NLRA and the APA and violates Curaleaf's constitutional rights.

For these reasons, this Court should grant Curaleaf's Petition for Review and deny the Board's Cross-Application for Enforcement.

## VI.   STANDING

Curaleaf has standing to seek review in this Court as an aggrieved party to a final order of the Board under 29 U.S.C. § 160(f). *See Retail Clerks Local 1059 v. NLRB*, 348 F. 2d 369, 370 (D.C. Cir. 1965).

14

## VII.   STANDARD OF REVIEW

Board orders "cannot be enforced" without court approval under the NLRA. *See Circus Circus Casinos, Inc. v. NLRB*, 961 F.3d 469, 475 (D.C. Cir. 2020). "Judicial review of the Board's decisions and orders must evaluate both the Board's statements of law and application to the facts." *Id.* at 483; *see also Hawaiian Dredging Constr. Co. Inc. v. NLRB*, 857 F.3d 877, 885 (D.C. Cir. 2017).

The APA prohibits administrative agencies, including the NLRB, from issuing orders that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *See ABM Onsite-Servs.-West, Inc. v. NLRB*, 849 F.3d 1137, 1142 (D.C. Cir. 2017) (quoting 5 U.S.C. § 706(2)(A)). This Court has repeatedly held Board findings that are inconsistent with the agency's own precedents do not evidence reasoned decision making and are arbitrary and capricious. *See Everport Terminal Servs. v. NLRB*, 47 F.4th 782, 793-94 (D.C. Cir. 2022); *Circus Circus Casinos, Inc.*, 961 F.3d at 475; *Tramont Mfg., LLC v. NLRB*, 890 F.3d 1114, 1119 (D.C. Cir. 2018).

Relatedly, this Court also routinely declines to enforce Board findings that lack the support of substantial evidence. *See Everport Terminal Servs.*, 47 F.4th at 793-94; *Windsor Redding Care Ctr., LLC v. NLRB*, 944 F.3d 294, 299 (D.C. Cir. 2019); *Cellco Partnership v. NLRB*, 892 F.3d 1256, 1260-61 (D.C. Cir. 2018); *Fred Meyer Stores, Inc. v. NLRB*, 865 F.3d 630, 638 (D.C. Cir. 2017); *see also*

*Allentown Mack Sales & Serv. v. NLRB*, 522 U.S. 359, 377-78 (1998). "The Board's obligation to engage with record evidence...is particularly acute when the opinion of a dissenting Member draws attention to such evidence." *See Windsor Redding Care Ctr., LLC*, 944 F.3d at 300.

## VIII. ARGUMENT

**A.    This Court Should Not Enforce the Board's Finding That Keane's Termination Violated the NLRA, as Board Precedent and Substantial Record Evidence Show the Termination Was Lawful.**

### 1.    *The Legal Standard For Applying <u>Wright Line</u>.*

"[E]mployers retain the right to discharge workers for any number of … reasons unrelated to [an] employee's union activities." *See Circus Circus Casinos*, 961 F.3d at 480 (internal citations omitted). When the General Counsel contends that an employer terminated an employee due to protected activity under the NLRA, rather than for legitimate reasons, "the Board applies the two-step inquiry of *Wright Line*." *See Windsor Redding Care Ctr., LLC*, 944 F.3d at 298.

Under *Wright Line* step one, "the General Counsel must . . . show that the employee's [protected] activity was a motivating factor" in a termination decision, which means that the General Counsel must show evidence of protected activity, employer knowledge of protected activity, and anti-union animus by the employer. *See Windsor Redding Care Ctr.*, 944 F.3d at 298; *Electrolux Home Prod. Inc.*, 368 NLRB No. 34, at *2-3 (2019); *see also Cellco Partnership*, 892 F.3d at 1264

16

(denying enforcement of Board order where this Court "[did] not find evidence to support a finding of anti-union animus").

The General Counsel does not automatically prove the presence of animus by pointing to evidence of protected activity, allegedly suspicious timing of an employment action, general anti-union animus, or alleged disparate treatment between employees. *See Boar's Head Provisions, Co.*, 370 NLRB No. 124, *133-34 (2021); *Electrolux Home Prod. Inc.*, 368 NLRB No. 34, at *3; *Queen of the Valley Med. Ctr.*, 368 NLRB No. 116, at *8-10 (2019); *Upper Great Lakes Pilots, Inc.*, 311 NLRB 131, 136 (1993). "Instead, the evidence [of animus] must . . . establish a causal relationship . . . between the ... protected activity and the ... adverse action." *See Tschiggfrie Properties, Ltd.*, 368 NLRB No. 120, at *11 (2019); (*see also* JA__; NLRB Dec. 3 n.11). The Board errs by ascribing motives to an employer's conduct absent support of record evidence while evaluating the General Counsel's *prima facie* case. *See Cellco Partnership*, 892 F.3d at 1261.

If (and only if) the General Counsel establishes a *prima facie* case, the *Wright Line* analysis moves to step two, where "the burden of persuasion shifts to the employer 'to show that it would have taken the same action in the absence of the unlawful motive.'" *See Windsor Redding Care Ctr.*, 944 F.3d at 298 (internal citations omitted). The Board improperly applies *Wright Line* if it "fail[s] to consider the employer's rebuttal case." *See Circus Circus Casinos*, 961 F.3d at

17

483. This Court has explained that "*Wright Line*'s second prong requires the Board to examine first, whether the employer 'reasonably believed' the employee committed the acts supporting discipline, and second, whether the decision was consistent with the company's 'policies and practice.'" *See Circus Circus Casinos*, 961 F.3d at 481; *see also Sutter E. Bay Hosps.*, 687 F.3d 424, 435-36 (D.C. Cir. 2012).

When evaluating whether the employer has met its *Wright Line* burden at step two, the Board "does not substitute its own business judgment for that of the employer in evaluating whether conduct was unlawfully motivated." *See Framan Mechanical Inc.*, 343 NLRB 408, 417 (2004) (quoting *Ryder Dist'n Resources, Inc.*, 311 NLRB 814, 816-17 (1993)). This Court has emphasized the same sentiment. *See, e.g.*, *Circus Circus Casinos*, 961 F.3d at 482; *Cellco Partnership*, 892 F.3d at 1262.

The General Counsel retains the ultimate burden of proving that an unfair labor practice occurred by preponderant evidence. *See Wright Line*, 251 NLRB 1083, 1088 n.11 (1980). "[T]he weaker a *prima facie* case against an employer under *Wright Line*, the easier for an employer to meet his burden...of proving that the [employer's action] would have occurred regardless of the protected activity." *See Sasol N. Am., Inc. v. NLRB*, 275 F.3d 1106, 1113 (D.C. Cir. 2002).

18

### 2.    *The Board Erred in Finding That the General Counsel Met Its Burden at Wright Line Step One*

Here, precedent reveals that the General Counsel failed to show Curaleaf harbored animus against Keane based on her protected activity, and accordingly, never proved a *prima facie* case.  Although the Board cites to precedent indicating ways in which the General Counsel can establish a *prima facie* case, (*see* JA225; NLRB Dec. 2 (citing *Shamrock Foods Co.*, 366 NLRB No. 107 (2018), *enf'd*, 779 Fed. App'x 752 (D.C. Cir. 2019)), such precedent does not support the Board's erroneous finding that the General Counsel established a *prima facie* case here.

The Board first concluded that the timing of Keane's termination evidenced animus. (JA225, NLRB Dec. 2). But the timing of Keane's termination related directly to her violations of Curaleaf policies under the Progressive Discipline Policy. Curaleaf issued discipline to Keane before it knew she ever engaged in union activity; Supervisor Neier further recommended escalating Keane's discipline before Curaleaf learned of Keane's union activity. (*See* JA18, JA57, JA68, JA73, JA138-41; Tr. 38, 139, 156, 165; R. Exs. 7-8). Curaleaf continued following its Progressive Discipline Policy after learning of Keane's union activity, issuing her a final written warning on July 17, 2020, even though the conduct underlying the final written warning was "extreme" and involved multiple separate violations. (JA21, JA70-71; Tr. 42, 160-61). Thus, the record reveals that it was Keane's frequent infractions, and not her union activity, that resulted in her

19

termination on August 28, 2020; indeed, the termination came less than one week after her August 22, 2020 error. (JA19, JA31, JA62, JA64-65, JA109-12; Tr. 39, 68, 147, 149-50; GC. Ex. 4). Given that Keane's disciplinary violations tracked her frequent errors, rather than her union activity, any "suspicious" timing is "of negligent evidentiary weight." *See Queen of the Valley Med. Ctr.*, 368 NLRB No. 116, at *10-14.

The Board failed to address *Queen of the Valley Medical Center* or the fact that record evidence explained the timing of Keane's disciplinary actions. Instead, it cited to a dissimilar case, *Mondelez Global*, to support its contention that the timing of Keane's termination reveals evidence of animus. In *Mondelez Global*, record evidence revealed that the employer disciplined three union stewards for time theft following an investigation into overtime use a few months after the three employees protested the employer's outsourcing of work. *See Mondelez Global, LLC*, 369 NLRB No. 46, at *2 (2020). Employer representatives testified that the investigation's purpose "was not to create grounds for discipline," but rather, "to assess...high overtime costs," which the employer was aware of for a year before it started investigating the employee at issue. *Id.* Unlike in *Mondelez Global*, Keane received discipline immediately following her egregious errors both before and after her union activity. Thus, *Mondelez Global* is inapposite and the Board has failed to show that the timing of Keane's termination evidenced animus.

20

Next, the Board relied on Curaleaf's three minor unfair labor practices in concluding that the General Counsel presented evidence of animus to sustain its burden under *Wright Line*. (JA226; NLRB Dec. 3). But "contemporaneous unfair labor practices" are "insufficient under extant Board law" to show a nexus between Keane's protected activity and her termination. *See Boar's Head Provisions, Co.*, 370 NLRB No. 124 at *133-34.

In contending otherwise, the Board has improperly compared Curaleaf's three isolated unfair labor practices to employers' much worse conduct in dissimilar cases. For example, the Board relied on *Kitsap Tenant Support Services*, 366 NLRB No. 98 (2018), where the employer committed *at least sixteen* separate unfair labor practices in comparison to Curaleaf's three. The Board, citing *East End Bus Lines, Inc.* and *Torrington Extend-A-Care Employee Association v. NLRB*, further implied that Curaleaf's decision to not challenge the unfair labor practices supports a finding of animus. (JA226; NLRB Dec. 3 n.10). But these cases are again inapposite, as the employer in *East End Bus Lines, Inc.* committed approximately eighteen unfair labor practices and only challenged two, *see* 366 NLRB No. 180, at 1, 43 (2018), and the employer in *Torrington Extend-A-Care Employee Association* declined to challenge *over one hundred* unfair labor practices, *see* 17 F.3d 580, 590 (2d Cir. 1994). Moreover, the unfair labor practices conceded by the employers in those cases were significantly more egregious than

21

the three uncontested charges in the present case, a factor the Board here failed to acknowledge.

The Board further erred in concluding that "HR Director Cade's statements during the July 31 union education meeting demonstrated specific animus against Keane," because "Cade stated that if employees organized, they would lose their tips, and that 'the person trying to organize the Union was just trying to get a job with the Union because she would get paid more.'" (JA226; NLRB Dec. 3). The Board cited to *Bardon, Inc.*, for the contention that calling union supporters "troublemakers" evidences animus, (JA226; NLRB Dec. 3), but there was no such testimony in the present case. Indeed, the Board did not cite any record evidence demonstrating "specific animus against Keane." (*See id.*). Thus, the Board has not shown that Curaleaf's three minor unfair labor practices evidenced animus.

Finally, the Board erroneously concluded that evidence of disparate treatment supported the ALJ's finding of animus. (JA226; NLRB Dec. 3). The ALJ found evidence of disparate treatment because Keane's supervisor, Cook, told her that she would need to accrue four cash handling violations before Curaleaf would terminate her employment, in conflict with the Company's description of its Progressive Discipline Policy. (JA237, JA239; NLRB Dec. 14, 16 (ALJ)). Finally, the ALJ improperly found a conflict in how Curaleaf treated Keane and Hubbard, based on the clearly erroneous statement that Keane "had not had any incidents

22

during the entirety of 2020 prior to the $20 error" for which she was terminated. (*Id.*).

As noted above, the Board disclaimed "giving credence to Cook's (incorrect) statement over Curaleaf's written policy, nor are we relying on it for the truth of the matter asserted." (JA227; NLRB Dec. 4 n.14). The Board claimed that instead, Cook's comment is relevant because it "calls into question" whether Curaleaf adhered to its Progressive Discipline Policy. (*See id.*). But this explanation is circular: in crediting Cook's statement, the Board is both "giving credence" to Cook's statement and "relying on it for the truth of the matter asserted," despite the Board's contrary claims. (*See id.*). In any event, Cook did not participate in the decision to terminate Keane's employment. (JA72; Tr. 162). And this Court has specifically noted that stray comments of a junior supervisor are insignificant in evaluating the legality of a termination under *Wright Line*. *See Cellco Partnership*, 892 F.3d at 1261 (quoting *MECO Corp. v. NLRB*, 986 F.2d 1434, 1437 (D.C. Cir. 1993)).

Next, comparisons of Keane's and Hubbard's cash handling incidents do not support the Board's claim that Curaleaf treated Keane disparately. The Board declined to rely on the ALJ's (incorrect) statement about Keane's disciplinary record: "[i]n adopting the judge's decision, we do not rely on his statement that Keane 'had not had any [cash-handling] incidents during the entirety of 2020 prior

23

to the [August 22] $20 error.'" (JA225, JA226; NLRB 2 n.8, 3). But the Board has still relied on false comparisons in concluding that Curaleaf treated Hubbard more leniently than Keane: (1) that Keane had two cash handling violations, compared to Hubbard's seven (JA227; NLRB Dec. 4), or (2) that Hubbard had seven cash handling violations compared to Keane's four erroneous transactions (*see id*.).

The first comparison—that Keane and Hubbard did not violate the Cash Handling Policy the same number of times—ignored record evidence that Keane committed errors besides cash handling errors, which the Board acknowledged only two pages earlier. (*Compare* JA227; NLRB Dec. 4, *with* JA225; NLRB Dec. 2). In finding disparate treatment by only comparing cash handling errors, the Board has ignored record evidence that Curaleaf's Progressive Discipline Policy treats all violations cumulatively.[7] (JA66-67; Tr. 153-54). The Board's error here is like the Board's error in *Hawaiian Dredging Construction Company Inc.*, where this Court denied enforcement of the Board's order after the Board placed "inappropriate emphasis" on one specific piece of evidence. *Hawaiian Dredging Constr. Co., Inc.*, 857 F.3d at 884. So too here, the Board has placed an

---

[7] Moreover, even if record evidence did not show that Curaleaf has terminated other employees for errors unrelated to cash handling, that fact does not point to a violation of the NLRA. *See Asarco, Inc. v. NLRB*, 86 F.3d 1401, 1410 (5th Cir. 1996) ("A violation of the Act is not established simply because an employee is first to be disciplined under existing policy.").

"inappropriate emphasis" on the number of Keane's cash handling incidents, ignoring or minimizing the fact that she committed many other violations as well.

The second comparison—that Keane had four erroneous transactions compared to Hubbard's seven cash handling violations—also ignored that Keane committed seven cash handling errors in one transaction and three in another, which the Board acknowledged only two pages earlier in its opinion. (*Compare* JA227; NLRB Dec. 4, *with* JA225; NLRB Dec. 2). Adding Keane's errors underlying her verbal warning and termination, Keane's errors totaled twelve,[8] compared to Hubbard's seven.[9] (*See* JA225; NLRB Dec. 2). In comparing the number of Keane's improper transactions to the numbers of Hubbard's violations, instead of comparing the number of Keane's violations to the number of Hubbard's violations, the Board drew a false equivalence, which this Court has faulted the Board for doing. *See Dupuy v. NLRB*, 806 F.3d 556, 564-65 (D.C. Cir. 2015) (faulting the Board for "mix[ing] apples and oranges" through its argument). As the Dissent correctly pointed out, the Board's numerical comparison was

---

[8] The Dissent concluded that Keane's May 1 written warning only listed six, rather than seven, separate errors. (JA231; NLRB Dec. 8 (Dissent)). It does not matter whether the Dissent is correct; even if the Dissent is correct, that would still mean that Keane made eleven errors, which is still far more than Hubbard's seven.

[9] Contrary to the Board, a finding that Keane committed more errors than Hubbard does not rely on the Dissent's conclusion that various separate transactions led to Keane's verbal warning. (*See* JA225; NLRB Dec. 2 n.8). Rather, the Board's own tally of Keane's errors reveals twelve errors compared to Hubbard's seven, even when counting the verbal warning as one violation. (*See* JA225; NLRB Dec. 2).

25

"misleading." (*See* JA233; NLRB Dec. 10 (Dissent)); *see also Windsor Redding Care Ctr., LLC*, 944 F.3d at 300. For this reason alone, the decision should not be enforced.

Even if the record established that Hubbard received more lenient treatment than Keane (it does not, as discussed above), the record does not reveal evidence of animus. Indeed, in *Mid-Mountain Foods, Inc.*, which the Board cited here, (JA227; NLRB Dec. 4), the Board expressly concluded that a termination was lawful even though the record revealed "some inconsistencies in [the employer's] administration of discipline." *See Mid-Mountain Foods, Inc.*, 350 NLRB 742, 743 (2007).

To support the contention that disparate treatment reveals evidence of animus, the Board cited to *Airgas USA*, 366 No. 104 (2018). But after deciding *Airgas USA*, the Board subsequently decided *Electrolux Home Products Inc.*, which clarified that evidence of disparate treatment does not establish animus unless "the surrounding facts tend to support that inference." *Electrolux Home Prod. Inc.*, 368 NLRB No. 34, at *3. Yet here, the Board has neither acknowledged *Electrolux Home Products Inc.* nor cited to what the "supporting facts" are. *See id.* Here, much like in *Electrolux Home Products Inc.*, "the General Counsel did not introduce any testimonial evidence elaborating on the circumstances of [Hubbard's]" termination. *See id.* at *3. The General Counsel had the opportunity

26

to elicit such testimony, considering that Cade testified she was involved in Hubbard's termination. (*See* JA22; Tr. 43). In declining to require that the General Counsel find out from Cade any further details about Hubbard's termination, the Board has left open the possibility that the "real reason" for the disparate treatment that the Board has perceived between Keane and Hubbard "might be animus against union or protected concerted activities, but then again it might not." *See Electrolux Home Prod. Inc.*, 368 NLRB No. 34, at *3. Thus, precedent does not support the Board's conclusion that disparate treatment evidenced animus here.

Rather than revealing that animus explained the difference between any treatment of Keane and Hubbard, the record reveals that the severity of Keane's conduct explains any difference in treatment. *Windsor Redding Care Center, LLC*, is further instructive. There, the Board concluded that the employer engaged in disparate treatment when it terminated one employee and only disciplined another employee. *See* 944 F.3d at 301. The Board concluded that the two employees engaged in "similar conduct" and further concluded that the employer did not believe the terminated employee's conduct was as severe as it stated. *See id.* This Court rejected the Board's reasoning. It found instead that the Board acted unreasonably in ignoring evidence that "innocuous[ly]" explained the employer's decision making. *Id.* at 301-02.

27

Similarly here, if Curaleaf's discipline of Keane and Hubbard reveals any evidence of disparate treatment (it does not), the record provided an explanation: Curaleaf found Keane's allotment violations (as compared to her cash handling violations) to be particularly severe. Before Keane ever engaged in union activity, Curaleaf referred to Keane's allotment errors as "egregious" and "awful." (JA139-41; R. Ex. 8). And contrary to the Board's statement that Curaleaf "does not assert that its concern over Keane's conduct was that she violated state law," (JA227; NLRB Dec. 4 n.18), Keane's final written warning specifically referenced her violation of state regulations, (JA136-37; R. Ex. 6).

The Board here, like the Board in *Windsor Redding Care Center, LLC*, did not meaningfully engage with the evidence indicating that Curaleaf believed Keane's conduct was particularly severe. *See* 944 F.3d at 301-02. Instead, the Board has explained it believes that the cash handling and allotment violations were equally severe because both issues would present compliance problems for Curaleaf according to the Arizona Department of Health Services' Medical Marijuana Inspection Sheet. (JA227; NLRB Dec. 4). To start, the record does not support its conclusion, as the Arizona Department of Health Services' Medical Marijuana Inspection Sheet mentions allotment procedures but does not mention cash-handling. (JA116-27, JA134-37; R. Exs. 1, 5-6). And as the Dissent noted, although the Board attempted to point to language in the Arizona Department of

28

Health Services' Medical Marijuana Inspection Sheet about inventory controls, "there is no necessary correlation between cash-drawer shortages and inventory discrepancies," given that "[a] cash-drawer shortage may reflect an error in making change or petty theft, with no inventory missing." (JA233; NLRB Dec. 10 (Dissent)).

In any event, even if the Board is correct that both cash handling and allotment errors were equally severe, the Board has still erred by substituting its own business judgment for Curaleaf's in assessing the severity of misconduct. To the contrary, in *Cellco Partnership* an administrative law judge, like the Board here, "examined other disciplinary cases" and "opined" on what conduct was worse. *See Cellco Partnership*, 892 F.3d at 1262. This Court rejected such reasoning, noting that the administrative law judge was "unabashedly taking on the company's business judgment chair—and that has been repeatedly held to be improper." *See id*.

Given that the Board has not properly applied relevant law in assessing whether the General Counsel met the first step of the *Wright Line* burden, its decision does not reflect reasoned decision making. *See Circus Circus Casinos, Inc.*, 961 F.3d at 483; *see also Hawaiian Dredging Constr. Co. Inc.*, 857 F.3d at 885 (denying cross-application for enforcement where Board's analysis was inadequate under applicable precedent). Thus, the Court should decline to enforce

29

the finding that Keane's termination violated the NLRA, as the General Counsel never proved a *prima facie* case under *Wright Line* step one.

### 3. The Board Erred in Finding That Curaleaf Would Not Have Terminated Keane Absent Union Activity

Even if the Board properly concluded that the General Counsel established a *prima facie* case under *Wright Line* step one, Curaleaf met its burden at *Wright Line* step two to show that it would have terminated Keane regardless of union activity, and the Board erred in concluding otherwise.

Preliminarily, the case law that the Board cited in its discussion of Curaleaf's burden at *Wright Line* step two does not support a conclusion that Curaleaf failed to meet its burden.[10] For example, the Board cited to *Palace Sports & Entertainment, Inc. v. NLRB,* 411 F.3d 212, 223 (D.C. Cir. 2005). (JA226; NLRB Dec. 3). But in that case, this Court denied enforcement of the Board's finding that the employer violated the NLRA by terminating an employee. *See Palace Sports & Entertainment, Inc.*, 411 F.3d at 225.

---

[10] The Board also cited case law suggesting that the second step of *Wright Line* may not be necessary where the employer's reason for an adverse action is pretextual. (*See* JA226; NLRB Dec. 3 n.12). But this Court has rejected similar reasoning "as a fundamental misstatement of *Wright Line*," as "[d]etermining an employer's explanation to be pretext is a legal conclusion that follows from the *Wright Line* analysis, not an upfront finding that short circuits consideration of the whole record." *See Circus Circus Casinos Inc.*, 961 F.3d at 482-83.

30

The Board also cited to *Bally's Park Place*, 355 NLRB 1319, 1327 (2010), *enf'd*, 646 F.3d 929 (D.C. Cir. 2011), for the assertion that an employer faces a higher burden at step two when the General Counsel's *prima facie* case is strong. (*See* JA226; NLRB Dec. 3). Although the Board here claimed that the General Counsel presented a "strong" *prima facie* case, it failed to explain why. (*See* JA228; NLRB Dec. 5). As discussed above, the General Counsel did not present a *prima facie* case at all. But even if the General Counsel had presented a *prima facie* case, it is weak, for all the reasons discussed above. Thus, the Court should not approach its analysis of Curaleaf's rebuttal case at *Wright Line* step two with the presumption that Curaleaf's burden is high; instead, Curaleaf's rebuttal burden is low, or at most, average. *See Sasol N. Am., Inc*, 275 F.3d at 1113.

The Board's analysis of the "step two" facts here similarly did not support its conclusion that Keane's termination violated the NLRA. This Court has explained that "*Wright Line*'s second prong requires the Board to examine first, whether the employer 'reasonably believed' the employee committed the acts supporting discipline, and second, whether the decision was consistent with the company's 'policies and practice.'" *See Circus Circus Casinos*, 961 F.3d at 481.

Record evidence leaves little doubt that Curaleaf "reasonably believed" that Keane violated Curaleaf policy. *See id.* The record includes evidence of Keane's erroneous transactions, including detailed written warnings,

31

contemporaneous email exchanges, and receipts from the erroneous transactions. (JA134-44: R. Exs. 5-9). Keane has also admitted to conducting the transactions underlying her written warning, final written warning, and termination. (JA31-35; Tr. 68-72). And although Keane testified that she did not recall receiving a verbal warning, the record reflects that Neier delivered one, and Cade testified that she believed Keane received the verbal warning. (*See* JA228, JA68; NLRB Dec. 5, Tr. 156).

The record also shows that Keane's termination was consistent with Curaleaf's practices. In this regard, the Board started its analysis incorrectly by noting that Curaleaf's four-step Progressive Disciplinary Policy did not require strict adherence because Curaleaf reserved the discretion to skip or combine disciplinary steps. (JA226; NLRB Dec. 3). But Curaleaf's flexibility under its policy is a fact that *supports* Curaleaf's rebuttal case. The language the Board quoted about Curaleaf's discretion to combine or skip disciplinary skips does not suggest that Curaleaf should exercise more leniency than the normal four-step model; it explains that Curaleaf may apply its policy with *less* leniency than the normal four-step model. (*See* JA226; NLRB Dec. 3); *see also Allentown Mack Sales & Serv.*, 522 U.S. at 378-79 (explaining Board must draw only those inferences "that the evidence fairly demands").

32

That Curaleaf had the discretion to skip disciplinary steps means that Curaleaf could have terminated Keane following any of her problematic transactions under its Progressive Discipline Policy. Instead, Curaleaf declined to do so until it had followed its standard Progressive Discipline Policy. As noted above, one manager recommended escalating Keane's discipline before Curaleaf was aware of Keane's union activity. The Board has entirely failed to address the facts that Curaleaf could have terminated Keane even sooner than it did or that Neier mentioned escalating Keane's discipline before Curaleaf was aware of her union activity. *See Fred Meyer Stores, Inc.*, 865 F.3d at 638 (denying cross-application for enforcement of Board decision that failed to "grapple with contrary evidence").

As discussed above, the Board's belief that Curaleaf applied its Progressive Discipline Policy more leniently toward Hubbard[11] than Keane was not supported by substantial evidence. (JA227; NLRB Dec. 4). Curaleaf presented both Keane and Hubbard with multiple warnings before terminating their employment, and notably, provided Keane with *more* warnings before terminating her than it did for Hubbard. (*See* JA113-15, 134-44; GC Ex. 5, R. Exs. 5-9). Further, as noted above, Curaleaf treated Keane more favorably than Hubbard by allowing her to

---

[11] The Board notes that Hubbard is "the only other employee whose disciplinary history is in the record." (JA227; NLRB Dec. 4). As Curaleaf has explained, however, most employees need only a verbal warning to correct any issues. (JA22; Tr. 43).

commit more violations before terminating her employment. *See supra*, Part VIII.A.2. The severity of Keane's conduct further demonstrates that Curaleaf did not deviate from its Progressive Discipline Policy in terminating Keane. *See supra*, Part VIII.A.2.

Citing to *Wendt Corporation*, 369 NLRB No. 135 (2020), *enf'd in part*, 26 F.4th 1002 (D.C. Cir. 2022), the Board concluded that while Curaleaf provided "a facially reasonable explanation" for Keane's termination, it must do more than identify a legitimate basis for a termination. (JA227-28; NLRB Dec. 4-5). But Curaleaf has done more; the Board just paid little attention. As noted above, the record reveals that Curaleaf believed Keane's errors to be particularly egregious, that one manager recommended escalating Keane's discipline before she was known to have engaged in union activity, that Curaleaf continued to apply its Progressive Discipline Policy after learning of Keane's union activity, and that Keane committed more violations and received more warnings than Hubbard. The Board's analysis at the second step of *Wright Line* has continually ignored and misconstrued record evidence and incorrectly applied the facts at issue here to relevant law. *See Circus Circus Casinos, Inc.*, 961 F.3d at 483; *see also Hawaiian Dredging Constr. Co. Inc.*, 857 F.3d at 885. Accordingly, the Court should not enforce the finding that Curaleaf violated the NLRA by terminating Keane.

**B.    This Court Should Not Enforce the Board's Extraordinary Notice Reading Remedy**

**1.    *Legal Standard for Reviewing the Board's Remedies***

The Board lacks the authority to fashion punitive remedies under the NLRA. *See USW*, 646 F.2d at 629-30; *see also Republic Steel Corp.*, 311 U.S. at 11 ("[W]e do not think that Congress intended to vest in the Board a virtually unlimited discretion to devise punitive measures."). Where the record does not reveal sufficient connection between the violations at issue and an ordered remedy, a proposed remedy from the Board "can only be explained as containing punitive measures designed to defer future violations of the [NLRA]." *See Florida Steel Corp. v. NLRB*, 713 F.2d 823, 835 (D.C. Cir. 1983).

A notice reading remedy is one type of extraordinary remedy that is "thus subject to the objection that it's unwarranted so long as traditional remedies suffice." *See HTH Corp. v. NLRB*, 823 F.3d 668, 674 (D.C. Cir. 2016). Circuit courts of appeals, including this Court, have criticized public notice readings:

> For those familiar with 20th century history, [a public notice reading] order conjures up the system of "criticism-self-criticism" devised by Stalin and adopted by Mao. "Criticism" generally took the form of an attack on the target by his or her peers at a meeting with fellow workers, spouting claims fed them by powerful members of the Communist party (on pain of themselves being tagged enemies of the people), and then regurgitated by the target ("self-criticism") in the hopes that full confession might avert dispatch to the gulag, torture or execution.

35

*HTH Corp. v. NLRB*, 823 F.3d 668, 677 (D.C. Cir. 2016); *see also Conair Corp. v. NLRB*, 721 F.2d 1355 (D.C. Cir. 1983) (Ginsburg, J., dissenting) (noting that although a public notice reading order "would occasion no surprise in a system in which those who offend against state regulation must confess and repent as a means of self-correction . . . it is foreign to our system . . . [and has] a punitive, vindictive quality"); *Denton Cty. Elec. Coop., Inc. v. NLRB*, 962 F.3d 161, 174-75 (5th Cir. 2020) (finding notice reading remedy problematic even where Board allowed for Board employee, rather than employer representative, to read the notice).

Along these lines, the Board has routinely observed that notice reading remedies are not appropriate even where the employer has committed multiple violations of the NLRA. *See Tesla, Inc.*, 370 NLRB No. 101, *38, 67 (2021); *Queen of the Valley Med. Ctr.*, 368 NLRB No. 116, at *5, 17; *Bodega Latina Corp.*, 367 NLRB No. 34, *4-5 (2018); *see also Castro Valley Animal Hospital, Inc.*, 370 NLRB No. 80, *95 (2021) ("Although there are several violations of the Act, including two employee terminations, I do not find this matter to be widespread and egregious to rise to the level of requiring a notice reading.").

**2.     *Board Precedent and Record Evidence Here Do Not Justify the Board's Decision to Impose a Notice Reading Remedy***

A notice reading remedy is not appropriate here. Even if the Court enforces the Board's finding that Keane's termination was unlawful, four violations of the

NLRA still would not warrant a public reading. *See Tesla, Inc.*, 370 NLRB No. 101, *38, 67 (concluding notice reading inappropriate where employer committed eight violations of the NLRA when it interrogated four employees, promulgated an unlawful rule in response to protected activity, threatened employees with a loss of stock options if employees selected the union, terminated one of the "most active union supporters," and issued a warning to another one of the union's most active supporters); *Queen of the Valley Med. Ctr.*, 368 NLRB No. 116, at **5, 17 (finding public notice reading unwarranted where employer committed six violations of the NLRA).

The Board presents various arguments and cases to support its notice reading remedy, but its arguments and cited cases are unpersuasive. The Board first relies on *Bozzuto's, Inc.*, in support of its notice reading remedy. (JA228; NLRB Dec. 5). There, however, the Board found that the employer committed seven separate unfair labor practices, compared to Curaleaf's (at most) four unfair labor practices. *See Bozzuto's*, 365 NLRB No. 146, at 1 & n.2 (2017). Moreover, the Second Circuit declined to enforce the notice reading remedy that the Board ordered in that case. The court noted that even though the employer "remain[ed] liable for engaging in several unfair labor practices—raising wages in an attempt to discourage employees from joining the [u]nion, adopting a restrictive speech policy for disciplined employees, warning [an employee] against talking with co-

37

workers about conditions of employment, and suspending and firing [an employee involved in union organizing] in reliance on fraudulent alternations of his production records," and even though "[t]hese are not inconsequential violations," the multiple violations "[did] not warrant an order for a public reading." *See Bozzuto's Inc. v. NLRB*, 927 F.3d 672, 686, 693 (2d Cir. 2019).  Thus, given that notice reading was not appropriate in *Bozzuto's, Inc.*, and given that Curaleaf has committed fewer unfair labor practices than the employer *in Bozzuto's, Inc.*, notice reading is certainly not appropriate here. *See id.* at 693.

The Board next contended, citing to *A.P.R.A Fuel Oil* and *Gavilion Grain, LLC*, that notice reading is appropriate here because Curaleaf terminated Keane. (JA228; NLRB Dec. 5). As discussed above, however, Keane's termination was lawful. But even if it was not, *A.P.R.A Fuel Oil* and *Gavilion Grain, LLC* are still inapplicable. *A.P.R.A. Fuel Oil* did not deal with a notice reading remedy, and once again, addressed employer conduct far more egregious than what occurred here. *See A.P.R.A. Fuel Oil Buyers Grp.*, 309 NLRB 480, 480-81, 483 (1992) (noting at least fourteen unfair labor practices but not ordering a notice reading remedy). *Gavilion Grain, LLC* also involves more violations of the NLRA—there, six violations of the NLRA—than what the Board alleges occurred here. *Contra*

38

*Gavilion Grain, LLC*, 371 NLRB No. 79, at *13 (2022).[12] Both Board and appellate court precedent further reflect that unlawful terminations do not alone render notice reading remedies appropriate. *See, e.g.*, *Bozzuto's Inc.*, 927 F.3d at 686, 693; *Tesla, Inc.*, 370 NLRB No. 101, *38, 67.

The Board has further cited to cases where circuit courts of appeal have upheld notice reading remedies that, like this remedy, require a specific management official to attend the notice reading—*HTH Corp. v. NLRB*, *NLRB v. Homer D. Bronson Co.*, and *Salem Hospital Corp.* But these cases also do not support the Board's notice reading remedy here. Although this Court upheld a notice reading remedy in *HTH Corp.*, it did so only after sharply criticizing notice reading remedies and only because of the egregious nature of the employer's conduct in that case. Specifically, in *HTH Corp.*, the employer had committed approximately nine separate violations of the NLRA after having previously violated the NLRA. *See HTH Corp.*, 823 F.3d at 671, 678. "Several" of the unfair labor practices violated a previous injunction against the employer. *See id.* at 671. Like the employer in *HTH Corp.*, the employer in *Salem Hosp. Corp.* had a history of committing NLRA violations. *See Salem Hosp. Corp.*, 363 NLRB 515, 515 n.3

---

[12] No circuit court of appeal has enforced the Board's decision in *Gavilion Grain, LLC*. *See*, 371 NLRB No. 79, at *13 (2022).

(2015).[13] And also like the employer in *HTH Corp.*, the employer in *Homer D. Bronson Co.*, committed many (thirteen) violations of the NLRA. *See NLRB v. Homer D. Bronson Co.*, 273 Fed. App'x 32, 35 (2d Cir. 2008).

Here, in direct contrast to *HTH Corp.* and *Salem Hosp. Corp.*, the Board has not pointed to a prior history of NLRA violations. *Contra HTH Corp.*, 823 F.3d at 671, 678. Further, Curaleaf did not violate the NLRA when it terminated Keane, but even if this Court finds otherwise, Curaleaf committed at most four violations of the NLRA, in direct contrast to the employers' thirteen and nine violations in *Homer D. Bronson Co.* and *HTH Corp. Contra HTH Corp.*, 823 F.3d at 671, 678 *and Homer D. Bronson Co.*, 273 Fed. App'x at 35.

Because Board precedent—including precedent that the Board has specifically cited—does not support a notice reading remedy here, the Board's decision to issue a notice reading remedy does not evidence reasoned decision making. *See Circus Circus Casinos*, 961 F.3d at 175-76; *see also Hawaiian Dredging Constr. Co., Inc.*, 857 F.3d at 885. Thus, the Court should not enforce the notice reading requirement.

### C.    This Court Should Not Enforce the Board's Extraordinary Union Access Remedy

As discussed above, the Board lacks the authority to fashion punitive

---

[13] Although the D.C. Circuit enforced the Board's decision issuing a notice reading remedy in *Salem Hospital Corp.*, it did so without discussion of the notice reading remedy. *See generally Salem Hosp. Corp. v. NLRB*, 808 F.3d 59 (D.C. Cir. 2015).

remedies under the NLRA, and remedies that are not necessary to respond to violations of the NLRA "can only be explained as containing punitive measures designed to defer future violations of the [NLRA]." *See USW*, 646 F.2d at 639. A union access remedy, like a notice reading remedy, is another type of extraordinary remedy. *See First Legal Support Services*, 342 NLRB 350, 350 n.6 (2004); *St. Francis Hospital*, 263 NLRB 834, 835 (1982); *see also Florida Steel Corp.*, 713 F.2d at 829; *USW*, 646 F.2d at 639.

In assessing whether it has properly justified the need for a union access remedy, the Board (and reviewing courts) should consider the fact "the NLRA confers rights only on employees, not on unions or their nonemployee organizers," that "[o]rganization rights are granted to workers by the same authority, the National Government, that preserves property rights," and that "[a]ccommodation between [organization rights and property rights] must be obtained with as little destruction of one as is consistent with the maintenance of the other." *See Lechmere Inc. v. NLRB*, 502 U.S. 527, 532 (1992); *NLRB v. Babcock & Wilcox Co.*, 351 U.S. 105, 112-13 (1956); *St. Francis Hospital*, 263 NLRB at 835.

Specifically, in *Babcock & Wilcox Co.*, the Supreme Court explained that when a union could access employees by "personal contacts on streets or at home, telephones, letters, or advertised meetings," "the employer [could] not be compelled" to allow the union access to its property. *See Babcock & Wilcox Co.*,

41

351 U.S. at 112. In other words, the "[a]ccommodation" between organizational rights and property rights only required union access where organizers could not otherwise reach employees. *See id.* at 112-13.

Following *Babcock & Wilcox, Co.*, the Supreme Court continued to reiterate this principle, explaining that "[s]o long as nonemployee union organizers have reasonable access to employees outside an employer's property, the requisite accommodation has taken place," and a further balancing of employer and employee rights—the exception to the rule in *Babcock & Wilcox Co.*—should only occur where the union lacks reasonable access. *See Lechmere Inc.*, 502 U.S. at 538. The Supreme Court also emphasized in *Lechmere Inc.* that the question in assessing whether a union lacks "reasonable access" to employees is not whether the union's access to employees is "cumbersome or less-than-ideally effective," but rather, whether "*the location of a plant and the living quarters of the employees* place the employees *beyond the reach* of reasonable union efforts to communicate with them." *See id.* at 539-40 ("*Access* to employees, not success in winning them over, is the critical issue.").

In *St. Francis Hospital*, the Board, citing *Babcock & Wilcox Co.*, rejected a union access remedy against an employer because "there was no evidence adduced to show that the Union did not have reasonable access to employees, or that the [employer] unlawfully enforced its rules to limit access to its employees by

42

nonemployee organizers or to curtail the activities of pro-union employees while encouraging the activities of antiunion employees." *See St. Francis Hosp.*, 263 NLRB at 835 ("[U]nder these circumstances...we see no justification for imposition of an equal access remedy"). The Sixth Circuit recently reached a similar conclusion. *See Sysco Grand Rapids, LLC v. NLRB*, 825 Fed. App'x 348, 360 (6th Cir. 2020) ("But here, neither the General Counsel nor the Union has made any showing that Sysco prevented the Local 406 from reaching Sysco's employees . . . . Without any foundation in a lack of access, the Board's access remedies cannot stand.").

Although this Court has concluded that a union access remedy may be appropriate absent evidence that a union could not reach employees through other means, *see Florida Steel Corp.*, 713 F.2d at 826 n.5; *USW*, 646 F.2d at 639, those rulings predated the Supreme Court's decision in *Lechmere*. As noted above, the Supreme Court in *Lechmere* clarified that when unions have alternative access to employees, the Board should not balance employer property rights against employee rights under the NLRA to assess whether union access is appropriate. *See Lechmere Inc.*, 502 U.S. at 538. In other words, following *Lechmere*, union access does not trump employer property rights without a prerequisite showing of lack of access. *See id.*

But even if the assertions in *USW* and *Florida Steel Corp.*—that union

43

access remedies may be appropriate notwithstanding alternative access—remain good law, this Court has nevertheless recognized that "the presence of *Babcock* cannot be totally ignored." *See USW*, 646 F.2d at 639. Specifically, this Court has explained that "before access is imposed, it is critical that a clear showing be made that access is needed to reassure employees of the existence and vitality of protected legal rights." *See id.* Without such a showing, "access cannot be justified as a remedial measure and instead may directly affront the principles announced in Babcock." *See id.* The Board made no such showing in the present case.

Regardless of whether this Court concludes that Curaleaf violated the NLRA through Keane's termination, the record here does not justify a *two-year long* union access remedy. No record evidence indicates that Curaleaf prevented the Union from accessing its employees or providing information to its employees and no record evidence indicates that Curaleaf employees were outside of the Union's reach. *See Lechmere Inc.*, 502 U.S. at 532; *Babcock & Wilcox Co.*, 351 U.S. at 112-13; *St. Francis Hospital*, 263 NLRB at 835. (JA36-37; Tr. 84-85).

The Board contends that Curaleaf "deprived its employees of access to accurate information about a union," by firing Keane, who was the employees' "main, daily source of information about the union." (JA228, JA229; NLRB Dec. 5, 6 n.20). But the Board has not shown why union access, rather than some other remedy, is necessary under these facts. *See Florida Steel Corp.*, 713 F.2d at 826

n.5; *USW*, 646 F.2d at 639. Indeed, the Union's physical presence is not necessary to provide employees with information about union representation in the internet age.

The Board further contends that the union access remedy is appropriate given Curaleaf's three section 8(a)(1) violations, (*see* JA228-29; NLRB Dec. 5-6 n.20), but again, the Board has not shown why traditional remedies would not respond to those violations, even though it was required to do so, *see First Legal Support Serv., LLC*, 342 NLRB at 350 n.6; *see also Florida Steel Corp.*, 713 F.2d at 826 n.5; *USW*, 646 F.2d at 639. The Board's notice posting remedy already responds directly to the section 8(a)(1) violations. (*See* JA229, JA241; NLRB Dec. 6, 18 (ALJ)). *Sysco Grand Rapids, LLC* is instructive here. There, the Sixth Circuit affirmed the Board's conclusion that the employer had committed violations of Section 8(a)(1) of the NLRA. *See Sysco Grand Rapids, LLC*, 825 Fed. App'x at 354-56. Yet, despite its earlier finding affirming the Section 8(a)(1) violations, the Sixth Circuit declined to affirm the Board's union access remedy, finding no foundation in the record for an access remedy. *See id.* at 354-56, 360.

Although the Board cites to *United Dairy Famers Cooperative Association* for the assertion that union access is appropriate where conventional remedies are inadequate, (JA228; NLRB Dec. 5), the Board still does not explain why conventional remedies are inadequate here. In any event, *United Dairy Farmers*

*Cooperative Association* is dissimilar from this case. There, the employer engaged in far more egregious conduct than what the General Counsel has alleged against Curaleaf, including terminating seven employees due to antiunion animus, converting employees to independent contractor status to prevent unionization, interrogating employees, and threatening closure. *See United Dairy Farmers Cooperative Ass'n v. NLRB*, 633 F.2d 1054, 1059 (3d Cir. 1980).[14] The employer in *United Dairy Farmers* was also a recidivist violator of the NLRA; the record does not reflect the same for Curaleaf. *Contra id.* at 1064. As for the Board's statement that employees need information about the Union "to 'assure employees a free and fair choice regarding union representation,'" (JA228; NLRB Dec. 5), this assertion also does not support the Board's access remedy. This Court has rejected such conclusory reasoning as insufficient to support a union access remedy. *See USW*, 646 F.2d at 639 ("In granting access as a remedial measure...[a] conclusory statement by the Board that access is needed to neutralize effects is not sufficient to justify a grant of access.").

---

[14] *Monfort of Colorado, Inc.*, which the ALJ cited in support of a union access remedy, also does not reveal why traditional remedies would not respond to Curaleaf's alleged violations in this case, as the employer's conduct in *Monfort* was again very different from Curaleaf's conduct here. (*See* JA240; NLRB Dec. 17 (ALJ)). In *Monfort*, the Board ordered a union access remedy after the employer (unlike Curaleaf) committed approximately fifteen violations of the NLRA. *See Monfort of Colorado, Inc.*, 298 NLRB 73, 87 (1990).

To support the two-year duration of the union access period, the Board cited to *Stern Produce Co.*, 368 NLRB No. 31 (2019), which, as the Dissent noted, is dissimilar from this case in terms of the severity of employer conduct at issue. (JA228, JA233; NLRB Dec. 5, 10 (Dissent)). Indeed, the employer in *Stern Produce Co.* committed approximately twelve separate unfair labor practices, compared to Curaleaf's three (or four). *See Stern Produce Co.*, 368 NLRB No. 31, at 6. In response, the Board stated that the Dissent cited to no authority indicating that the severity of an employer's conduct controls the duration of a union access remedy. (JA228; NLRB Dec. 5 n.20). But if severity does not provide the basis for the two-year duration, then no such basis exists. The Board's only explanation for ordering the two-year duration is that a two-year duration is "[c]onsistent with prior decisions" (JA228; NLRB Dec. 5); the only decision it cited was *Stern Produce*. Such limited explanation from the Board "cannot survive judicial scrutiny," *see Sutter E. Bay Hosps. v. NLRB*, 687 F.3d at 436, particularly given the Board's obligation to explain the justifications for extraordinary remedies like this one, *see First Legal Support Serv., LLC*, 342 NLRB at 350 n.6.

Accordingly, because the record does not reflect that Curaleaf denied the Union access to its employees and does not reflect that traditional remedies would not adequately respond to the situation here, the record does not support a decision to order a union access remedy at all, and at a minimum, does not support the

47

remedy's two-year duration. Thus, this Court should decline to enforce the union access remedy.

### D.    The Board's Extraordinary Remedies Violate Curaleaf's Constitutional Rights

The Supreme Court has concluded that "the First Amendment does not 'leave it open to public authorities to compel [a person] to utter' a message with which he does not agree." *Johanns v. Livestock Mktg. Ass'n*, 544 U.S. 550, 557 (2005) (*quoting W. Va. Bd. of Ed. v. Barnette*, 319 U.S. 624, 634 (1943). The Court has further concluded that "measures burdening the freedom of speech or association must serve a compelling interest and must not be significantly broader than necessary to serve that interest." *See Knox v. SEIU*, Local 1000, 567 U.S. 298, 313-14 (2012); *Roberts v. U.S. Jaycees*, 468 U.S. 609, 623 (1984).  For similar reasons, the Board's extraordinary notice reading and union access remedies should be denied enforcement, as they infringe on Curaleaf's constitutional rights of free speech and free association. *See also Sysco Grand Rapids, LLC v. NLRB*, 825 Fed. App'x at 359 ("As for the Board order to publicly read the notice to Sysco employees during work hours, we acknowledge Sysco's First Amendment objections and join our sister circuits in their skepticism of such orders.").

The extraordinary union access remedy also violates the Takings Clause of the Constitution, in accordance with the Supreme Court's recent holding in *Cedar Point Nursery v. Hassid*, 141 S. Ct. 2063 (2021). There, a state regulation granted

48

labor organizations a "right to take access" to an agricultural employer's property in order to solicit support for unionization. *Id.* at 2069. The Court found the union access requirement appropriated a right to invade the growers' property and therefore constituted a *per se* physical taking, further noting: "The right to exclude is 'a fundamental element of the property right.'" *Id.* at 2072-2074. For the same reason, the Board's extraordinary access remedy cannot stand in the present case and should be denied enforcement.

## IX.    CONCLUSION

For the reasons set forth above, Curaleaf asks that its Petition for Review be granted and that the Board's Cross-Application for Enforcement be denied.

August 16, 2023                                 Respectfully submitted,


                                                */s/ Maurice Baskin*
                                                Stefan Marculewicz
                                                Maurice Baskin
                                                Emily Carapella
                                                Littler Mendelson, P.C.
                                                815 Connecticut Ave., N.W.
                                                Washington, D.C. 20006
                                                202-842-3400
                                                smarculewicz@littler.com
                                                mbaskin@littler.com
                                                ecarapella@littler.com

                                                *Attorneys for Absolute Healthcare,*
                                                *d/b/a Curaleaf Arizona*

49

## CERTIFICATE OF WORD COUNT COMPLIANCE

Pursuant to FRAP 32(a)(7) the Petitioner certifies that this motion contains 11,435 words of proportionally-spaced, 14-point type, and the word processing system used was Microsoft Word.

*/s/Maurice Baskin*
Maurice Baskin

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing Petitioner's Opening Brief was electronically transmitted to the Court this 16th day of August, 2023, using the Court's ECF filing system, and was served on all counsel via electronic notice pursuant thereto.

*/s/Maurice Baskin*
Maurice Baskin

## STATUTORY ADDENDUM

## TABLE OF CONTENTS

**SECTION 8 OF THE NLRA** ................................................................A-1

**SECTION 10 OF THE NLRA** ..............................................................A-1

**SECTION 706 OF THE APA** ..............................................................A-3

**Arizona Revised Statutes Section 36-2806.02**……………………………..A-4

**Arizona Administrative Code Rule 9-17-314**…………………………………A-5

<u>**Section 8 of the NLRA, 29 U.S.C. § 158**</u>:

**(a) Unfair labor practices by the employer**

It shall be an unfair labor practice for an employer—

**(1)** to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title; * * *

**(3)** by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization:….

<u>**Section 10 of the NLRA, 29 U.S.C. § 160**</u>:

**(e) Petition to court for enforcement of order; proceedings; review of judgment**

The Board shall have power to petition any court of appeals of the United States, or if all the courts of appeals to which application may be made are in vacation, any district court of the United States, within any circuit or district, respectively, wherein the unfair labor practice in question occurred or wherein

A-1

such person resides or transacts business, for the enforcement of such order and for appropriate temporary relief or restraining order, and shall file in the court the record in the proceedings, as provided in section 2112 of title 28. Upon the filing of such petition, the court shall cause notice thereof to be served upon such person, and thereupon shall have jurisdiction of the proceeding and of the question determined therein, and shall have power to grant such temporary relief or restraining order as it deems just and proper, and to make and enter a decree enforcing, modifying and enforcing as so modified, or setting aside in whole or in part the order of the Board. No objection that has not been urged before the Board, its member, agent, or agency, shall be considered by the court, unless the failure or neglect to urge such objection shall be excused because of extraordinary circumstances. The findings of the Board with respect to questions of fact if supported by substantial evidence on the record considered as a whole shall be conclusive. If either party shall apply to the court for leave to adduce additional evidence and shall show to the satisfaction of the court that such additional evidence is material and that there were reasonable grounds for the failure to adduce such evidence in the hearing before the Board, its member, agent, or agency, the court may order such additional evidence to be taken before the Board, its member, agent, or agency, and to be made a part of the record. The Board may modify its findings as to the facts, or make new findings by reason of additional evidence so taken and filed, and it shall file such modified or new findings, which findings with respect to questions of fact if supported by substantial evidence on the record considered as a whole shall be conclusive, and shall file its recommendations, if any, for the modification or setting aside of its original order. Upon the filing of the record with it the jurisdiction of the court shall be exclusive and its judgment and decree shall be final, except that the same shall be subject to review by the appropriate United States court of appeals if application was made to the district court as hereinabove provided, and by the Supreme Court of the United States upon writ of certiorari or certification as provided in section 1254 of title 28.

**(f) Review of final order of Board on petition to court**

Any person aggrieved by a final order of the Board granting or denying in whole or in part the relief sought may obtain a review of such order in any United States court of appeals in the circuit wherein the unfair labor practice in question was alleged to have been engaged in or wherein such person resides or transacts business, or in the United States Court of Appeals for the District of Columbia, by filing in such a court a written petition praying that the order of the Board be modified or set aside. A copy of such petition shall be forthwith transmitted by the clerk of the court to the Board, and thereupon the aggrieved party shall file in the

court the record in the proceeding, certified by the Board, as provided in section 2112 of title 28. Upon the filing of such petition, the court shall proceed in the same manner as in the case of an application by the Board under subsection (e), and shall have the same jurisdiction to grant to the Board such temporary relief or restraining order as it deems just and proper, and in like manner to make and enter a decree enforcing, modifying, and enforcing as so modified, or setting aside in whole or in part the order of the Board; the findings of the Board with respect to questions of fact if supported by substantial evidence on the record considered as a whole shall in like manner be conclusive.

## Section 706 of the APA, 5 U.S.C. § 706:

To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall— * * *

**(2)** hold unlawful and set aside agency action, findings, and conclusions found to be—

**(A)** arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

**(B)** contrary to constitutional right, power, privilege, or immunity;

**(C)** in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

**(D)** without observance of procedure required by law;

**(E)** unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or

**(F)** unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.

In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error.

**Section 36-2806.02 of the Arizona Revised Statutes**

A. Before marijuana may be dispensed to a registered designated caregiver or a registered qualifying patient, a nonprofit medical marijuana dispensary agent must access the verification system and determine for the registered qualifying patient for whom the marijuana is intended and any registered designated caregiver transporting the marijuana to the patient, that:

1. The registry identification card presented to the registered nonprofit medical marijuana dispensary is valid.

2. Each person presenting a registry identification card is the person identified on the registry identification card presented to the nonprofit medical marijuana dispensary agent.

3. The amount to be dispensed would not cause the registered qualifying patient to exceed the limit on obtaining no more than two-and-one-half ounces of marijuana during any fourteen-day period.

B. After making the determinations required in subsection A, but before dispensing marijuana to a registered qualifying patient or a registered designated caregiver on a registered qualifying patient's behalf, a nonprofit medical marijuana dispensary agent must enter the following information in the verification system:

1. How much marijuana is being dispensed to the registered qualifying patient.

2. Whether it was dispensed directly to the registered qualifying patient or to the registered qualifying patient's registered designated caregiver.

3. The date and time the marijuana was dispensed.

4. The registry identification card number of the nonprofit medical marijuana dispensary and of the nonprofit medical marijuana dispensary agent who dispensed the marijuana.

**Rule 9-17-314 of the Arizona Administrative Code (2019)**

Before a dispensary agent dispenses medical marijuana to a qualifying patient or a designated caregiver, the dispensary agent shall:

**1.** Verify the qualifying patient's or the designated caregiver's identity,

**2.** Offer any appropriate patient education or support materials,

**3.** Enter the qualifying patient's or designated caregiver's registry identification number on the qualifying patient's or designated caregiver's registry identification card into the medical marijuana electronic verification system,

**4.** Verify the validity of the qualifying patient's or designated caregiver's registry identification card,

**5.** Verify that the amount of medical marijuana the qualifying patient or designated caregiver is requesting would not cause the qualifying patient to exceed the limit on obtaining no more than two and one-half ounces of medical marijuana during any 14-calendar-day period, and

**6.** Enter the following information into the medical marijuana electronic verification system for the qualifying patient or designated caregiver:

**a.** The amount of medical marijuana dispensed,

**b.** Whether the medical marijuana was dispensed to the qualifying patient or to the qualifying patient's designated caregiver,

**c.** The date and time the medical marijuana was dispensed,

**d.** The dispensary agent's registry identification number, and

**e.** The dispensary's registry identification number.